COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys, Clements, Kelsey,
            McClanahan, Haley, Petty and Beales
Argued at Richmond, Virginia


CHRISTOPHER ALLEN WILLIAMS
                                                        OPINION BY
v.      Record No. 0843-05-1                   JUDGE JAMES W. HALEY, JR.
                                                        MARCH 20, 2007
COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
AND COUNTY OF JAMES CITY
Samuel Taylor Powell, III, Judge

George U. Brooks, III (Wood & Brooks, on brief), for appellant.

Eugene Murphy, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


        This matter comes before the Court from a divided and unpublished panel decision

rendered on March 14, 2006 and reported as Williams v. Commonwealth, 06 Vap UNP 0843051

(2006). By order of March 21, 2006, that panel decision was stayed, and a petition for rehearing

en banc granted.

                                        I.

        Christopher Allen Williams, found guilty of possession of a firearm by a felon under

Code § 18.2-308.2, asserts the trial court erred in denying his motion to suppress the firearm

seized by police. We affirm.

Initially we note, with respect to our review of a motion to suppress, "we consider the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial." Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004) (citing Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 923-24 (2000)).

Furthermore, "[s]ince the constitutionality of a search and seizure under the Fourth Amendment involves questions of law and fact, we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." Id. at 672-73, 594 S.E.2d at 598 (citing McCain v. Commonwealth, 261 Va. 483, 490, 545 S.E.2d 541, 545 (2001)).

III.

On August 20, 2004, Sergeant Jeremy Barnett of the James City County Police Department was informed that appellant was staying with a girlfriend at 206-C Burton Woods Drive in that county. Records show that an apartment at that address was rented to Tara Bowman, and the appellant was not a tenant under the lease. Sergeant Barnett had in his possession two arrest warrants for appellant, one a capias from the Juvenile and Domestic Relations District Court of James City County and the other a show cause from the circuit court of that county.

206-C Burton Woods Drive is located in a two-story apartment complex, with both "upstairs" and "downstairs" apartments. The apartment here involved is an "upstairs" apartment, that is, there is a front door, which opens upon a stairway leading directly to the second floor where the rooms are actually located. A banister is situated at the top of the stairs.

Sergeant Barnett knocked on the front door of the apartment at approximately 9:20 p.m. on the 20th. Ms. Bowman opened the door, and Sergeant Barnett asked if he could enter. Ms. Bowman said he could, but asked him to delay coming upstairs so she could put on additional clothing. She shut the door. Two or three minutes later she returned and advised Sergeant Barnett that she had spoken with her brother, a Newport News police officer, who advised her not to let the police enter without a search warrant. She denied appellant was in the apartment and said she had not seen him for a year. Sergeant Barnett advised her that he would attempt to obtain a search warrant and withdrew to a sidewalk in the apartment complex leading to the front door.

Five to ten minutes later Sergeant Barnett saw Ms. Bowman, and a child he estimated at "seven to ten years old," leave the apartment, enter a vehicle, and leave. At trial, the transcript shows the following exchange during the cross-examination of Sergeant Barnett:

> Q: Okay. You never talked to Mr. Williams --
>
> A: I did not.
>
> Q: -- yourself?
>
> A: No, sir.
>
> Q: But you were present the whole time?[1]
>
> A: Yes.
>
> Q: And after Ms. Bowman and her daughter left, there was no indication anybody else was in the apartment?
>
> A: From some of the neighbors, yes, there was. We had several people come up - -
>
> Q: From your observations.

---

[1] Sergeant Barnett led the subsequent "protective sweep."

A: Not immediately, no, sir. [sic] Not until after some conversation with an individual on the phone did I see somebody inside the apartment.

Q: Which was him?

A: Yes.

Q: Mr. Williams?

A: Yes.

Q: That's the only person you saw?

A: Yes, but at the time I didn't know it was him.

\* \* \* \* \* \* \*

A: I can't say for sure there was no one else in the apartment, and the only thing I could see was a figure in the window. It was dark inside the apartment. I would assume it was him.

Within an hour, a woman approached Sergeant Barnett and advised she was Ms. Bowman's sister. Barnett testified the woman told him that "Ms. Bowman had come to her residence scared . . . and asked [her] to relate to us, the police, that Mr. Williams was inside the apartment and he had a gun and that we had her permission to go inside."[2]

Officer Patrick McFarland was standing "out in front of the apartment complex." Almost contemporaneous to Sergeant Barnett's conversation with Ms. Bowman's sister, McFarland saw a woman "crying and talking on [a cell] phone." This woman, Judy Pressey, approached McFarland, and advised him she was speaking with her brother Chris, the appellant, and permitted the officer to talk on the cell phone. Officer McFarland advised appellant he was a policeman, and appellant "interrupted me and said that the door was barricaded, and that he was

---

[2] Defendant interposed a hearsay objection to this testimony. The trial court, nonetheless, accepted the testimony upon the representation by the Commonwealth that it was "not being offered for the truth of the matter but just for what the officers do next and how things progressed." The question of an entry by the consent of Ms. Bowman, the actual tenant, was not presented to the trial court or to this Court. Accordingly, we will not address it.

- 4 -

armed . . . [and] . . . that he was going to come out shooting if we came in from the front door." At this point, police called a SWAT team.

One member of the SWAT team was Officer Jerry White, a negotiator. He telephoned apartment 206-C and identified himself. The appellant repeatedly told Officer White that he was "heavily armed and the door is barricaded. If anybody comes through that he's going to open fire." He stated he had "a handgun." After several hours of negotiation, Officer White persuaded appellant to surrender. He told appellant "to leave the handgun at the top of the steps which leads down to the front door." Appellant, unarmed, exited the front door with his hands raised and was taken into custody. During the negotiation process, a number of neighbors and members of appellant's family had arrived on the scene.

Immediately following the surrender, Sergeant Barnett and two other officers opened the front door and proceeded up the stairs. The purpose of the entry, as Sergeant Barnett testified, was for a "protective sweep and attempt to locate a handgun that we believed was inside." A handgun was found in plain view "on top of the banister at the top of the staircase." The sergeant and the other officers searched the apartment "to see if there was anyone else in there," "for the presence of other people." The "sweep" did not involve a search into "cupboards" or "drawers" but only into areas in which a person could be found. When asked if he was not going in just to look for other people, but also for the gun, Sergeant Barnett replied, "Yes, that was secondary. The securing of the weapon."

The weapon recovered from the top of the staircase, where appellant had been directed by the negotiator to place it, was identified as a loaded, functional semiautomatic nine-millimeter handgun. Barnett testified that the "sights, trigger, hammer, all seemed to be functional." In response to the trial court's question "Is it operational," Barnett testified "as best as I can tell, yes, Your Honor. The slide goes forward, trigger works, the hammer . . . the barrel's intact."

- 5 -

The appellant was indicted for possession of a firearm after having been previously convicted of a violent felony, in violation of Code § 18.2-308.2. At trial, appellant argued a motion to strike on the basis that the Commonwealth failed to show the firearm seized was operational. The trial court denied that motion, and appellant appealed the issue to this Court.

A motion to suppress the handgun was filed on the grounds that the warrantless search and seizure of the same violated Code § 19.2-60[3] and the Constitutions of Virginia and the United States. After hearing evidence and relevant argument, the trial court denied the motion, finding, *inter alia*, that exigent circumstances permitted the police "to do a protective sweep to make sure there's no one else in the apartment who has access to this weapon" and recover the loaded weapon when "the mother and young child . . . will be coming back into the house."[4]

After finding the appellant guilty, and in accordance with the mandatory minimum provisions of Code § 18.2-308.2, the trial court sentenced appellant to five years in the penitentiary.

IV.

Our analysis begins with firm recognition of the constitutional principles that warrantless searches are presumptively unreasonable and "that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).

---

[3] Code § 19.2-60 provides, "A person aggrieved by an allegedly unlawful search or seizure may move the court to return any seized property and to suppress it for use as evidence."

[4] In addition to a "protective sweep," the trial court also found the search permissible under the "community caretaker" exception to the warrant requirement. We do not address this finding. See Armstrong v. Nationwide Mut. Ins. Co., 215 Va. 333, 333, 209 S.E.2d 903, 903 (1974) ("The chancellor, in his opinion letter, set forth alternate grounds for his holding. We must affirm this ruling if the chancellor was correct on either ground. We need consider only the chancellor's first ground . . . .").

Nonetheless, "[t]he Fourth Amendment [of the United States Constitution] is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." United States v. Sharpe, 470 U.S. 675, 682 (1985) (emphasis in original). See also Jones v. Commonwealth, 29 Va. App. 363, 368-69, 512 S.E.2d 165, 167 (1999). In determining reasonableness, the United States Supreme Court has held on numerous occasions, "there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" Michigan v. Long, 463 U.S. 1032, 1046 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (additional citation omitted). "Reasonableness [ ] is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996)

A.

ENTRY

In Illinois v. McArthur, 531 U.S. 326 (2001), the United States Supreme Court addressed warrantless searches:

> We nonetheless have made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. . . . Consequently, rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the entry was reasonable.

531 U.S. at 330-31.

An exception to the warrant requirement for a search of premises is the "protective sweep." In Maryland v. Buie, 494 U.S. 325 (1990), the United States Supreme Court defined this concept as follows:

> A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police

- 7 -

officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. . . . [T]he Fourth Amendment would permit the protective sweep undertaken here if the searching officer "possessed a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted' the officer in believing," Michigan v. Long, 463 U.S. 1032, 1049-1050 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)), that the area swept harbored an individual posing a danger to the officer or others.

494 U.S. at 327.

In Buie, the area swept included a basement, which officers searched after the defendant had been taken into custody inside his home. Here, the protective sweep took place immediately after the defendant had been placed into custody just outside the apartment's front door. That distinction, however, does not in and of itself render a protective sweep unreasonable.

Other jurisdictions agree that a warrantless search into a defendant's home may be reasonable even when the arrest occurs outside the dwelling. In United States v. Lawlor, 406 F.3d 37 (1st Cir. 2005), the court held,

We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene.

406 F.3d at 41. See also United States v. Cavely, 318 F.3d 987, 995-96 (10th Cir. 2003); United States v. Wilson, 306 F.3d 231, 238 (5th Cir. 2002); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995); United States v. Hoyos, 892 F.2d 1387, 1397 (9th Cir. 1989), overruled on other grounds by United States v. Ruiz, 257 F.3d 1030, 1031 (2001) ("Whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to

- 8 -

another."); United States v. Steele, 788 F. Supp. 278, 281-82 (N.D. W.Va. 1992); Nelson v. State, 610 S.E.2d 627 (Ga. Ct. App. 2005); People v. Cartwright, 563 N.W.2d 208, 213 (Mich. 1997).

A protective sweep is reasonable if "reasonably articulable facts" exist to show that the area searched "could harbor an individual posing a threat to those on the scene." Lawlor, 406 F.3d at 41. Protective sweeps are thus permissible based on less than probable cause. See Buie, 494 U.S. at 327; United States v. Beckham, 325 F. Supp. 2d 678, 688 (E.D. Va. 2004); People v. Celis, 93 P.3d 1027, 1036 (Cal. 2004) ("A protective sweep can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person." (emphasis in original)).

We acknowledge, as the dissent points out, that the standard for reviewing the existence of an "exigent circumstances" exception to the warrant requirement is one of probable cause, Minnesota v. Olsen, 495 U.S. 91, 100 (1990), while the standard for reviewing the protective sweep exception is one of "reasonable suspicion." Buie, 494 U.S. at 327. That distinction, however, does not preclude from appellate review what courts have termed exigent circumstances or including such circumstances in evaluating the propriety of a protective sweep. Consequently, one author has concluded,

> A "protective sweep" is really a constitutional hybrid. It is a Terry - Long protective weapons search of a dwelling . . . . A "protective sweep" could also be considered a form of search incident [to arrest]. . . . Protective sweeps are thus premised on exigent circumstances.

1 John Wesley Hall, Jr., Search and Seizure § 19.24 (3d ed. 2000). For example, in Horton v. California, 496 U.S. 128 (1990), the Supreme Court cited Buie for the proposition that "a warrantless search be circumscribed by the *exigencies* which justify its initiation." 496 U.S. at 139-40 (emphasis added).

In <u>Verez v. Commonwealth</u>, 230 Va. 405, 337 S.E.2d 749 (1985), the Virginia Supreme Court approved a warrantless entry based upon exigent circumstances. The Court deemed relevant, *inter alia*, the following circumstances:

> (1) the degree of urgency involved and the time required to get a warrant . . . (3) the possibility of danger to others, including police officers left to guard the site . . . (5) whether the offense is serious, or involves violence . . . .

230 Va. at 410-11, 337 S.E.2d at 753.

Though dealing with probable cause, in <u>Keeter v. Commonwealth</u>, 222 Va. 134, 278 S.E.2d 841 (1981), the Virginia Supreme Court held,

> [t]he officers are not required to possess either the gift of prophecy or the infallible wisdom that comes only with hindsight. They must be judged by their reaction to circumstances as they reasonably appeared to trained law enforcement officers to exist when the decision to enter was made.

222 Va. at 141, 278 S.E.2d at 846.[5]

Likewise, "[t]he validity of an entry for a protective sweep without a warrant depends on the reasonableness of the response, *as perceived by police*." <u>Cartwright</u>, 563 N.W.2d at 213 (emphasis in original). <u>See also</u> <u>State v. Brennan</u>, 474 S.E.2d 267, 270 (Ga. Ct. App. 1996) ("Although we review police actions from the standpoint of a hypothetical 'reasonable' officer, we must measure those actions from the foresight of an officer acting in a quickly developing situation and not from the hindsight of which judges have benefit.").

Here, the defendant told at least two police officers that he was "heavily armed" and intended to shoot any officer who entered the premises. He later informed Officer White "that

---

[5] This Court has also expressed a reluctance to second-guess the judgment of police officers in the context of a Fourth Amendment search and seizure. <u>See</u> <u>Alston v. Commonwealth</u>, 40 Va. App. 728, 743, 581 S.E.2d 245, 252 (2003) ("Even though this case did not involve a situation that was overtly dangerous . . . 'our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations.'" (quoting <u>United States v. White</u>, 648 F.2d 29, 36 (1981))).

he had a handgun." Accordingly, the officers could conclude, by either a probable cause or reasonable suspicion standard, that there was at least one loaded weapon in the area subject to the protective sweep. And, if one claims to be heavily armed, it is reasonable to believe multiple weapons are present. A loaded, accessible weapon, by definition, may cause "danger to the officer or others." Buie, 494 U.S. at 327.

In Steele, the police, responding to a domestic disturbance call, escorted the defendant's girlfriend to an apartment she shared with him. While there officers noticed "a young man" other than the defendant at the residence. As the officers were taking the girlfriend to another location, the defendant, standing in front of the apartment, fired a rifle into the air and retreated inside the apartment. He later emerged, unarmed, and was taken into custody. Affirming the denial of a motion to suppress, the court stated:

> [T]he parties have subsequently focused their arguments on the existence of exigent circumstances justifying a warrantless search. In particular, the focus rests on the protective sweep exception to the warrant requirement as most recently discussed in Maryland v. Buie, 494 U.S. 325, 108 L. Ed. 2d 276, 110 S. Ct. 1093 (1990).
>
> * * * * * * *
>
> Defendant argues that any reasonable threat to the officers' safety ended upon his arrest approximately ten feet outside his apartment. Defendant premises this argument upon the claim that the officers cannot point to articulable facts supporting the concern that a person remained inside the apartment and posed a continuing threat to their safety. . . .
>
> * * * * * * *
>
> . . . Defendant eventually surrendered, exiting the residence without the weapon.

788 F. Supp. at 281-82. Several witnesses testified that "the young man" had left the apartment. The court continued:

- 11 -

> Defendant was not able to discredit Deputy Martin's testimony that he simply did not know whether the young man remained in the apartment.

*   *   *   *   *   *   *

> The Court is absolutely convinced that the above justifies a reasonable inference that a danger may have existed in the interior of the apartment. . . . A loaded, functioning weapon was known to be present in the rear portion of the residence.

Id.

The dissent cites Colbert for the proposition that where a police officer does not "have any information at all," a reasonable suspicion cannot arise that a residence may harbor "an individual posing a danger to the officer or others." We agree. But in Colbert, there were no relevant facts, and thus no rational inference therefrom, to raise a reasonable suspicion.

By contrast, police officers here did have information indicating the presence of others inside the apartment. In response to defense counsel's question "was [there] any indication anybody else was in the apartment," Barnett replied, "From some of the neighbors, yes there was." Sergeant Barnett further testified, "I can't say for sure there was no one else in the apartment," because he had seen an unidentifiable person standing near a second story window in the "dark" apartment. These factors certainly provided information for the officers there to be concerned that others might be in the apartment.

As noted above, Buie justified a warrantless entry not just because of potential danger to police but also potential danger to others. The crowd which had gathered, including neighbors, bystanders, and members of the defendant's family, was subject to immediate danger if the weapon or weapons were accessible to any individual who might still be in the apartment or in the crowd that had gathered. Moreover, that crowd compounded the problem of denying access to the premises pending application for a search warrant.

The facts in this case are undisputed. Accordingly, we are to decide *de novo* the "ultimate question" of whether or not the officers violated the Fourth Amendment. Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citation omitted). That question is whether these facts, to a prudent officer on the scene, generated a "reasonable suspicion" that the apartment may "harbor an individual posing a danger to the officer and others." Buie, 494 U.S. at 327. We conclude the "reasonable suspicion" threshold was met given the presence of both exigent circumstances and at least one loaded weapon. The protective sweep here was a "quick and limited" minimal intrusion, as prescribed by Buie. Id. After "balanc[ing] the privacy-related and law enforcement-related concerns," we hold the protective sweep did not violate the Fourth Amendment. McArthur, 531 U.S. at 331.

Finally, the dissent maintains that "the Commonwealth failed to articulate any facts that would have justified an objectively reasonable belief that an individual inside the home posed a danger to the arresting officers." However, in oral argument en banc appellant conceded that the testimony of Sergeant Barnett was ambiguous, that is, susceptible to two factual interpretations. One interpretation, documented in the transcript and one specifically accepted by the trial court, was that the officer articulated a reasonable belief that an individual, with access to a weapon, may have remained in the apartment following appellant's arrest.

In Ornelas v. United States, 517 U.S. 690 (1996), the Supreme Court set forth the following standard for reviewing motions to suppress and one particularly applicable to the instant case.

> We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to

- 13 -

inferences drawn from those facts by resident judges and local law enforcement officers.

517 U.S. at 699.

That standard has been repeatedly applied by this Court. See Kyer v. Commonwealth, 45 Va. App. 473, 479, 612 S.E.2d 213, 216-17 (2005) (en banc); Slayton, 41 Va. App. at 105, 582 S.E.2d at 449; McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997).

The trial court specifically found that circumstances permitted the police "to do a protective sweep to make sure there's no one else in the apartment who has access to this weapon." As the Ornelas Court concluded its opinion: "An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable." 517 U.S. at 700. We do so here.

B.

PLAIN VIEW

In Harris v. Commonwealth, 241 Va. 146, 400 S.E.2d 191 (1991), the Virginia Supreme Court reiterated the requirements of the "plain view doctrine":

> "It is . . . an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view, its incriminating character must also be 'immediately apparent.' Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."

241 Va. at 153, 400 S.E.2d at 195 (quoting Horton, 496 U.S. at 136-37 (additional citations omitted)). "The phrase 'immediately apparent' has been construed as requiring that the investigating officer possess probable cause to seize the item without further investigation." Taylor v. Commonwealth, 10 Va. App. 260, 266, 391 S.E.2d 592, 595 (1990).

- 14 -

In Crosby v. Commonwealth, 6 Va. App. 193, 367 S.E.2d 730 (1988), this Court upheld the seizure of a weapon, a sawed-off shotgun, found in plain view by officers while securing the defendant's apartment. There, the Court held that officers were justified in securing the premises, described as a "limited security check" akin to the protective sweep conducted in this matter. "Because [the] Detective [] was lawfully securing the premises, the evidence in plain view, i.e., the sawed-off shotgun, was subject to seizure under the plain view exception to the warrant requirement." 6 Va. App. at 202, 367 S.E.2d at 736.

Here, we held that the police officers did not violate the Fourth Amendment by conducting a protective sweep of the apartment. Because of the appellant's threats to police and repeated claims of being "heavily armed," officers had probable cause to believe that the gun, in plain view at the top of the stairs, was connected to appellant's criminal activity. See Cantrell v. Commonwealth, 7 Va. App. 269, 285, 373 S.E.2d 328, 336 (1988) ("The police [] had probable cause to associate these items with criminal activity."). Therefore, it was permissible for officers to seize the gun as a part of their protective sweep of the apartment. Accordingly, the trial court properly denied appellant's motion to suppress.

V.

Additionally, appellant argued during his motion to strike that Code § 18.2-308.2 requires the Commonwealth to prove the seized firearm was operable and that the Commonwealth failed to do so. However, in Kingsbur v. Commonwealth, 267 Va. 348, 351, 593 S.E.2d 208, 210 (2004), the Virginia Supreme Court defined the burden of the Commonwealth under this statute. "The Commonwealth was required to prove beyond a reasonable doubt that the handgun . . . was designed, made, and intended to fire or expel a projectile by means of an explosion. It was not obligated to prove that the handgun was operable." Id. See also Armstrong v. Commonwealth, 263 Va. 573, 583-84, 562 S.E.2d 139, 145 (2002) ("And we are further of opinion that to read

- 15 -

into Code § 18.2-308.2 by implication a requirement that the meaning of the term 'firearm' includes an element of present capacity or operability would amount to an unreasonably restrictive interpretation of that term and subvert the intent of the General Assembly."). On brief, "appellant acknowledges that the Virginia Supreme Court rejected [his] interpretation [of Code § 18.2-308.2] in Armstrong . . . ." Accordingly, appellant's argument that the Commonwealth must prove operability under Code § 18.2-308.2 lacks merit, and we hold the trial court properly denied his motion to strike.

## VI.

For the foregoing reasons, we affirm the trial court's denial of appellant's motion to suppress and find the evidence sufficient to sustain the conviction.

Affirmed.

Humphreys, J., with whom Benton and Elder, JJ., join, dissenting.

Because I disagree with the majority's assertion that the officers' entry into the home constituted a valid protective sweep, I respectfully dissent. Under the circumstances of this case, the Commonwealth failed to articulate any facts that would have justified an objectively reasonable belief that an individual inside the home posed a danger to the arresting officers. Thus, I would hold that the trial court should have granted Williams' motion to suppress, and I would reverse his conviction for possession of a firearm by a convicted felon.

Initially, I note that the trial court, when denying the motion to suppress, relied upon two separate legal theories, only one of which is discussed by the majority. First, the trial court found that the warrantless entry was permissible because the officers were "entitled to do a protective sweep to make sure there's no one else in the apartment who has access to this weapon that Mr. Williams has told them is there." Second, the trial court held that the community caretaker doctrine validated the warrantless entry, reasoning that the weapon was "left out in an open situation where the child could get to it if they came back into the house." In my opinion, neither doctrine validates the warrantless search at issue in this case.

I.

Warrantless searches are presumptively unreasonable. See, e.g., Megel v. Commonwealth, 262 Va. 531, 534, 551 S.E.2d 638, 640 (2001). This is quintessentially so when police search a person's home. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house," Steagald v. United States, 451 U.S. 204, 212 (1981), and, "[a]bsent exigent circumstances, the threshold [of a dwelling] may not reasonably be crossed without a warrant," Hill v.

Commonwealth, 18 Va. App. 1, 3, 441 S.E.2d 50, 52 (1994). As noted by the majority, however, the Supreme Court has delineated various exceptions to this rule, one of which is the "protective sweep" doctrine.

In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court defined a "protective sweep" as "a quick and limited search of the premises, incident to an arrest[, which is] . . . conducted to protect the safety of police officers or others[, and] . . . is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327. In Buie, however, the Court distinguished between two "tiers" of protective sweeps. First, an arresting officer, "as a precautionary matter and without probable cause or reasonable suspicion," may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. "Beyond that, however, . . . there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id.

Under the circumstances of this case, Williams was arrested outside of the apartment building. Because the area to be swept was not "immediately adjoining the place of arrest," the "first tier" standard for protective sweeps is clearly inapplicable. See Sharrar v. Felsing, 128 F.3d 810, 824 (3d Cir. 1997) ("[A] sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the Buie analysis."); State v. Spencer, 848 A.2d 1183, 1193 (Conn.) ("In the present case, the defendant was arrested in a first floor common hallway at the bottom of a stairway of approximately twelve to fourteen steps leading up to his second floor apartment. Therefore, the defendant's apartment cannot be characterized as a space 'immediately adjoining' the place of arrest."), cert. denied, 543 U.S. 957 (2004); cf. Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) ("*If the suspect moves about*,

an officer is justified in staying with the individual during the course of the stop and conducting a protective search of the areas which come within the suspect's immediate control, even if this action necessitates entry into the suspect's home." (emphasis added)).[6]

Rather, this case must be analyzed under the standard articulated for the "second tier" of protective sweeps—specifically, the Commonwealth must have presented "articulable facts" that would have warranted an objectively reasonable belief that the apartment continued to "harbor an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334; see also United States v. Jeffers, 342 U.S. 48, 51 (1951) (noting that the government bears the burden of establishing facts sufficient to support application of an exception to the warrant requirement); Megel, 262 Va. at 534, 551 S.E.2d at 640 ("[T]he Commonwealth has the heavy burden of establishing an exception to the warrant requirement."). Notably, because Williams was already in police custody, "the focus of our inquiry is 'whether the arresting officers reasonably believed that *someone else inside the [home]* might pose a danger to them.'" Spencer, 848 A.2d at 1194 (quoting United States v. Colbert, 76 F.3d 773, 777 (6th Cir. 1996)) (emphasis and alteration in original).

_____

[6] I agree, however, that the fact that an arrest occurred outside a home does not, in and of itself, preclude the officers from conducting a protective sweep inside the residence. See, e.g., United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005) ("We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene."). However, because, under those circumstances, the officers would not have yet crossed the threshold of the residence, the Commonwealth must provide a strong showing of articulable facts sufficient to justify the belief that there was an individual inside the house and that, absent immediate intervention, that individual poses a danger to the arresting officers. I further note that the risk of harm to the arresting officers cannot be created merely by the fact that the officers entered the residence, for, in that situation, the officers would have created the risk of harm themselves, something they are not constitutionally permitted to do. See, e.g., United States v. Webster, 750 F.2d 307, 328 (5th Cir. 1984) (holding that, where law enforcement officers "create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby").

Although the majority recognizes this general rule, it fails to apply it to the facts of this particular case.[7]  Specifically, the record is devoid of any "articulable facts" that would support a reasonable suspicion that "an individual posing a danger" to the arresting officers was inside the "area to be swept."  Buie, 494 U.S. at 334.  Thus, in my view, the officers' entry cannot be validated as a "second tier" protective sweep.  See id.

In Walls v. Commonwealth, 2 Va. App. 639, 347 S.E.2d 175 (1986), for example, this Court invalidated a post-arrest warrantless entry into the defendant's home, reasoning that the entry was unconstitutional because the officer "pointed to no specific facts from which he could reasonably have concluded that either he or anyone else was in danger."  Id. at 648, 347 S.E.2d at 180.  Although recognizing that "there is an exception to the warrant requirement allowing police officers to enter a building in response to a dangerous situation or an emergency," we reasoned that the protective sweep doctrine did not apply because "there was no evidence[] that there were dangerous persons in the [residence]."  Id. at 649, 347 S.E.2d at 181.

Similarly, here, the officers "pointed to no specific facts" that would have led the officers to believe "there were dangerous persons in the [residence]."  Id.  The Commonwealth presented no evidence that the apartment, a private residence in which a small child had been sleeping,

---

[7] The majority apparently relies on a hybridization of the exigent circumstances exception and the protective sweep doctrine.  Although I recognize the similarities between the two theories, they are, in fact, separate and distinct constitutional doctrines requiring the application of different legal standards.  Specifically, officers may enter a home under the exigent circumstances exception if they have probable cause to believe that an individual inside the home poses a present danger to the public at large.  See Minnesota v. Olsen, 495 U.S. 91, 100 (1990).  A protective sweep, however, "can be justified by a standard lower than probable cause, namely, reasonable suspicion."  People v. Celis, 93 P.3d 1027, 1036 (Cal. 2004); see Buie, 494 U.S. at 334 (analogizing a protective sweep to a brief pat down under Terry v. Ohio, 392 U.S. 1 (1968), or a search conducted during a traffic stop under Michigan v. Long, 463 U.S. 1032 (1983), both of which are founded upon a reasonable suspicion that the search is necessary to protect officer safety).  However, because the "lower standard" for performing a protective sweep under Buie "was not satisfied here, it follows that the higher standard requiring probable cause was not met either."  Celis, 93 P.3d at 1036.

might be harboring additional dangerous individuals.  See Spencer, 848 A.2d at 1196 (invalidating protective sweep where "the officers' testimony reveal[ed] that they had no information that any person who posed a threat to the officers or to others might have been in the apartment at that time"); cf. United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (upholding post-arrest protective sweep into defendant's home where an informant "had advised officers . . . that [the defendant's] 'boys' or 'counterparts' might be with him").  After making their presence known, the officers secured the premises and did not observe anyone other than Bowman and her child entering or exiting the apartment.  Cf. United States v. Steele, 788 F. Supp. 278, 282 (N.D. W.Va. 1992) (holding that the officers presented sufficient articulable facts to justify a "reasonable inference that a danger may have existed in the interior of the apartment" where, *inter alia*, "there had been a brief period during which a person could have arrived at the apartment unobserved by the officers").

Moreover, during the course of his extended conversations with law enforcement officials, Williams never implied, nor is there any other evidence to suggest, that anyone else was inside the apartment.  Cf. Crosby v. Commonwealth, 6 Va. App. 193, 202, 367 S.E.2d 730, 736 (1988) (upholding warrantless entry based, in part, on the defendant's "evasiveness when [police] asked him if anyone was at the apartment").  The officers did not see anyone else inside the apartment, nor, after Williams emerged, did they observe any signs—such as voices or sounds—that anyone remained in the apartment.  See, e.g., People v. Celis, 93 P.3d 1027, 1035 (Cal. 2004) (holding that a post-arrest protective sweep of the defendant's home was not justified where the officers "had no knowledge of the presence of anyone in defendant's house," reasoning that "[t]he facts known to the officers before they performed the protective sweep fell

short of what <u>Buie</u> requires"). And, indeed, the record is clear that neither officer believed that anyone other than Williams remained inside the apartment after he emerged from the residence.[8]

---

[8] The majority states that the officers had information from "neighbors" that individuals other than Williams might be inside the apartment. I believe, however, that this assertion inaccurately characterizes the testimony of the police officer. The entire evidence on this point—elicited during cross-examination—reads as follows:

> [Defense Counsel]: And *after Ms. Bowman and her daughter left*, there was no indication anybody else was in the apartment?
>
> [Officer]: From some of the neighbors, yes, there was. We had several people come up –
>
> [Defense Counsel]: From your observations.
>
> [Officer]: Not immediately, no, sir. Not until after some conversation with an individual on the phone did I see somebody inside the apartment.
>
> [Defense Counsel]: Which was him?
>
> [Officer]: Yes.
>
> [Defense Counsel]: Mr. Williams?
>
> [Officer]: Yes.
>
> [Defense Counsel]: *That's the only person you saw?*
>
> [Officer]: *Yes*, but at the time I didn't know it was him.

(Emphasis added). Moreover, and as the majority notes, shortly after Ms. Bowman left the residence, her sister approached police to convey information from Bowman. Specifically, the officer testified that she stated, "Mr. Williams was inside the apartment and he had a gun and that we had [Bowman's] permission to go inside." Significantly, Ms. Bowman's information conveyed via her sister in no way suggests that anyone other than Williams remained in the residence. Taken in context, then, the officer's testimony clearly establishes that, "after Ms. Bowman and her daughter left," the officer believed there was *only* one other individual inside the apartment, specifically, Williams. This is the only reasonable inference supported by the evidence. This testimony, even when viewed in the light most favorable to the Commonwealth, does not establish that the officer believed individuals other than Williams remained in the apartment *after he emerged*.

- 22 -

Accordingly, the Commonwealth failed to carry its "heavy burden" of presenting any "articulable facts" that would have justified an objectively reasonable belief that another individual was inside the residence, much less that there was an individual inside the apartment who posed a danger to the fifteen or twenty law enforcement officers surrounding the apartment. Although, as the officers testified, the police did not know "for sure there was no one else in the apartment," it is clear that "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." Colbert, 76 F.3d at 778 (holding that a protective sweep was unconstitutional where the officer "didn't have any information at all" as to whether "anyone was inside the [defendant's] apartment"); see also United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir. 1988) (holding that a protective sweep was unconstitutional where officers had "no information that any other persons were in the apartment"). As the Sixth Circuit has explained,

> allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep. . . . [A]llowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court's explicit command in Buie that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home. "No information" cannot be an articulable basis for a sweep that requires information to justify it in the first place.

Colbert, 76 F.3d at 778; see also State v. Hopkins, 55 P.3d 691, 695 (Wash. Ct. App. 2002) ("[A] 'general desire to be sure that no one is hiding in the place searched is not sufficient' to justify a protective sweep outside the immediate area where an arrest has occurred." (quoting State v. Schaffer, 982 P.2d 961, 966 (Idaho Ct. App. 1999))).

Thus, to prevail on this theory, the Commonwealth must present "articulable facts" from which a reasonable police officer could infer that *at the time of the "sweep*," the apartment was

- 23 -

harboring an individual who posed a danger to "those on the arrest scene," Buie, 494 U.S. at 334. In my view, the Commonwealth failed to do so.

The majority notes that, "in oral argument *en banc* appellant conceded that the testimony of Sergeant Barnett was ambiguous." While his counsel answered in the affirmative in response to the question "wasn't the testimony [of Sergeant Barnett] ambiguous," I do not view counsel's response as the equivalent of a factual concession that *at the time of the entry*, the evidence could be reasonably interpreted as indicating the apartment was occupied by anyone else. Nonetheless, based upon this "concession," the majority asserts that because of its ambiguity, the testimony "was subject to two factual interpretations" and that one interpretation, "and one specifically accepted by the trial court, was that the officer articulated a reasonable belief that an individual, with access to a weapon, may have remained in the apartment *following appellant's arrest.*" (Emphasis added.) I respectfully disagree with the majority that Sergeant Barnett's testimony, in the context of the information relayed from Ms. Bowman, admits to more than one reasonable interpretation. While the statement attributed to neighbors may have been ambiguous in the abstract, it is not at all ambiguous when placed on a time line and in context with the totality of the information available to the police *at the time they conducted the sweep*. The Commonwealth had the burden to establish a reasonable suspicion of occupancy at the time the protective sweep was conducted. This is the crucial distinction ignored by the majority. That is, the totality of the circumstances must be such that it was reasonable for the officers to conclude that someone other than Williams was in the apartment at the time they conducted the sweep. As the events unfolded, it is clear that although three people initially occupied the apartment, two departed prior to the "standoff" between Williams and police and, as noted, the record does not indicate that Ms. Bowman, who was in the best position to know, did not indicate that anyone other than Williams remained in the apartment following her departure.

Once Bowman departed, a lengthy period of negotiations between the police and Williams followed.  The record reflects no evidence whatsoever that during the negotiations, Williams provided information or the police observed anything that would give rise to a suspicion that anyone other than Williams was in the apartment once Ms. Bowman and her child left.

It was the Commonwealth's burden to establish the necessity for the protective sweep at the time it was conducted, and in my view, the "ambiguous" testimony of Sergeant Barnett upon which the majority relies, is insufficient as a matter of law to do so.  By the time Williams surrendered, it is clear that from the totality of the circumstances, and indeed as conceded by Sergeant Barnett in his testimony, that *at the time the officers entered the home*, they believed no one else was in the house.  In fact, Barnett testified that the "figure in the window" disappeared with Williams' exit from the apartment.  Moreover, the officers knew that the only other known occupants — Williams' girlfriend and her child — had left the building hours earlier.

The police in this case could easily have recovered Williams' weapon without transgressing the Fourth Amendment by securing the consent of Ms. Bowman who was apparently in the area and readily accessible or the Commonwealth could have elected to rely upon the permission she had already given.  However, they simply decided not to do so.  Accordingly, I would hold that the officers could not, consistent with the Fourth Amendment, cross the threshold of the apartment in order to conduct a protective sweep. See Walls, 2 Va. App. at 649, 347 S.E.2d at 181.

## II.

Because I would find that the trial court erred in its application of the protective sweep exception to the warrant requirement, I must address the remaining legal theory articulated by the trial court in support of its ruling.  However, for the reasons that follow, I likewise conclude

that the trial court's reliance on its second articulated basis for denying the motion to suppress, the community caretaker doctrine, was error.

The "community caretaker doctrine" authorizes, under certain circumstances, a warrantless search of a residence if that search is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973); see also Kyer v. Commonwealth, 45 Va. App. 473, 612 S.E.2d 213 (2005) (*en banc*). The appropriateness of applying the community caretaker doctrine is determined by whether, based upon the totality of the circumstances, it was reasonable for the officer to believe that his or her actions were necessary for, *inter alia*, protection of the public and the police from physical danger. Williams v. Commonwealth, 42 Va. App. 723, 730, 594 S.E.2d 305, 309 (2004). Overall, "[o]bjective reasonableness remains the linchpin of determining the validity of [the] action." Commonwealth v. Waters, 20 Va. App. 285, 290, 456 S.E.2d 527, 530 (1995).

When a law enforcement officer conducts a warrantless entry in an attempt to protect against "physical danger," however, this Court has held that the entry does not fall within the scope of the community caretaker doctrine unless the officer possessed a reasonable belief that "someone's health or safety is genuinely threatened." Kyer, 45 Va. App. at 480, 612 S.E.2d at 217. Here, the trial court found that the community caretaker doctrine validated the warrantless entry because the gun was "left out in an open situation where the child could get to it if they came back into the house or when they came back into the house." It is undisputed, however, that the child was not, in fact, inside the apartment at the time of Williams' arrest. Nor, according to their trial testimony, did the officers believe that any other individual remained inside the apartment. And Williams, the only identifiable person who might have posed a threat, was outside, handcuffed, lying on the ground, and surrounded by fifteen to twenty police

- 26 -

officers.  Because Williams "was in custody, he no longer posed a threat to the [public or the] police."  Henry, 48 F.3d at 1284.

Thus, the officers could not have reasonably believed that anyone—including the child—faced a risk of immediate harm or injury.  Indeed, had the mother and child returned to the apartment, the officers could have ensured their continued safety merely by "freezing the scene" and preventing them from entering the apartment until a search warrant had been obtained and executed.  Accordingly, I would also hold that the trial court erred in its alternate conclusion that the community caretaker doctrine validated the warrantless entry.  See, e.g., United States v. McGough, 412 F.3d 1232, 1239 (11th Cir. 2005) (holding that the community caretaker doctrine was inapplicable where the police "had the situation under control" because the defendant "was under arrest and in custody in the police cruiser," and there were no "exigent circumstances, such as the sounds of gunshots, fighting [or] the potential danger to human life . . . that would have justified the officers' decision to enter [the defendant's] home"); cf. Lowe v. Commonwealth, 218 Va. 670, 677, 239 S.E.2d 112, 117 (1977) (holding that a warrantless entry was justified by exigent circumstances where "the officer had just ascertained the whereabouts of [an] armed robber," and the robber "was in close proximity to two deadly weapons in plain view," reasoning that "[t]he delay, however slight, incident to obtaining a warrant would . . . increase[e] the danger of further violence to the police themselves and to the community at large").

### III.

Unquestionably, "the work of a police officer in the field is often fraught with danger." Celis, 93 P.3d at 1036.  However, "[s]ociety's interest in protecting police officers must . . . be balanced against the constitutionally protected interest of citizens to be free of unreasonable searches and seizures."  Id.  "In considering both interests, the United States Supreme Court has articulated certain legal rules," id., and this Court is not at liberty to ignore those established

- 27 -

constitutional standards. For this reason, I would hold that the warrantless entry in this case does not fall within the scope of the community caretaker exception, nor was it a permissible "protective sweep."

Because the warrantless entry and search violated Williams' Fourth Amendment rights, I would hold that the trial court erred in denying Williams' motion to suppress. And, because I would reverse and remand this case for a new trial if the Commonwealth be so advised, I would not reach the issue of whether the evidence was sufficient to support Williams' conviction. Thus, I respectfully dissent.

# *VIRGINIA:*

*In the Court of Appeals of Virginia on*  **Tuesday**  *the*  **2nd**  *day of*  **May, 2006**.

Christopher Allen Williams, Appellant,

 against  Record No. 0843-05-1
  Circuit Court No. CR14195-00

Commonwealth of Virginia, Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Benton, Elder, Frank, Humphreys,
Clements, Kelsey, McClanahan, Haley and Petty

On March 21, 2006 came the appellant, by court-appointed counsel, and filed a petition praying that the Court set aside the judgment rendered herein on March 14, 2006, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on March 14, 2006 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established: Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc* within 14 days of the date on which the appellee's brief is filed. The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter.  It is further ordered that the appellant shall file twelve additional copies of the

appendix previously filed in this case.


A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Felton and Haley
Argued at Chesapeake, Virginia


CHRISTOPHER ALLEN WILLIAMS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0843-05-1              JUDGE JAMES W. HALEY, JR.
                                                    MARCH 14, 2006
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
                        AND COUNTY OF JAMES CITY
                        Samuel Taylor Powell, III, Judge

           (George U. Brooks, III; Wood & Brooks, on brief), for appellant.
           Appellant submitting on brief.

           Susan L. Parrish, Assistant Attorney General (Judith Williams
           Jagdmann, Attorney General, on brief), for appellee.


       Christopher Allen Williams, found guilty of possession of a firearm by a felon under

Code § 18.2-308.2, asserts the trial court erred in denying his motion to suppress the firearm

seized by police.  We affirm.

                                              I.

       Initially we note, with respect to our review of a motion to suppress, "we consider the

evidence and all reasonable inferences flowing from that evidence in the light most favorable to

the Commonwealth, the prevailing party at trial."  Jackson v. Commonwealth, 267 Va. 666, 672,

594 S.E.2d 595, 598 (2004) (citing Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921,

923-24 (2000)).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Furthermore, "[s]ince the constitutionality of a search and seizure under the Fourth Amendment involves questions of law and fact, we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." Jackson, 267 Va. at 672-73, 594 S.E.2d at 598 (citing McCain v. Commonwealth, 261 Va. 483, 490, 545 S.E.2d 541, 545 (2001)).

II.

On August 20, 2004, Sergeant Jeremy Barnett of the James City County Police Department was informed that appellant was staying with a girlfriend at 206-C Burton Woods Drive in that county. Records show that an apartment at that address was rented to Tara Bowman, and the appellant was not a tenant under the lease. Sergeant Barnett had in his possession two arrest warrants for appellant, one a capias from the Juvenile and Domestic Relations District Court of James City County and the other a show cause from the circuit court of that county.

206-C Burton Woods Drive is located in a two-story apartment complex, with both "upstairs" and "downstairs" apartments. The apartment here involved is an "upstairs" apartment, that is, there is a front door, which opens upon a stairway leading directly to the second floor where the rooms are actually located. A banister is situated at the top of the stairs.

Sergeant Barnett knocked on the front door of the apartment at approximately 9:20 p.m. on the 20th. Ms. Bowman opened the door, and Sergeant Barnett asked if he could enter. Ms. Bowman said he could, but asked to delay so she could put on additional clothing. She shut the door. Two or three minutes later she returned and advised Sergeant Barnett that she had spoken with her brother, a Newport News police officer, who advised her not to let the police enter without a search warrant. She denied appellant was in the apartment and said she had not

- 2 -

seen him for a year.  Sergeant Barnett advised her that he would attempt to obtain a search warrant and withdrew to a sidewalk in the apartment complex leading to the front door.

Five to ten minutes later Sergeant Barnett saw Ms. Bowman, and a child he estimated at "seven to ten years old," leave the apartment, enter a vehicle, and leave.  At trial, defense counsel asked Barnett whether "there was [any] indication anybody else was in the apartment."  Barnett's response and the ensuing exchange are as follows:

> A:  From some of the neighbors, yes, there was.  We had several people come up - -
>
> Q:  From your observations.
>
> A:  Not immediately, no, sir. [sic] Not until after some conversation with an individual on the phone did I see somebody inside the apartment.
>
> Q:  Which was him?
>
> A:  Yes.
>
> Q:  Mr. Williams?
>
> A:  Yes.
>
> Q:  That's the only person you saw?
>
> A:  Yes, but at the time I didn't know it was him.
>
> *   *   *   *   *   *   *
>
> A:  I can't say for sure there was no one else in the apartment, and the only thing I could see was a figure in the window.  It was dark inside the apartment.  I would assume it was him.

Within an hour, a woman approached Sergeant Barnett and advised she was Ms. Bowman's sister.  Barnett testified the woman told him that "Ms. Bowman had come to her

residence scared . . . and asked [her] to relate to us, the police, that Mr. Williams was inside the apartment and he had a gun and that we had her permission to go inside."[1]

Officer Patrick McFarland was standing "out in front of the apartment complex." Almost contemporaneous to Sergeant Barnett's conversation with Ms. Bowman's sister, McFarland saw a woman "crying and talking on [a cell] phone." This woman, Judy Pressey, approached McFarland, and advised him she was speaking with her brother Chris, the appellant, and permitted the officer to talk on the cell phone. Officer McFarland advised appellant he was a policeman, and appellant "interrupted me and said that the door was barricaded, and that he was armed . . . [and] . . . that he was going to come out shooting if we came in from the front door." At this point, police called a SWAT team.

One member of the SWAT team was Officer Jerry White, a negotiator. He telephoned apartment 206-C and identified himself. The appellant repeatedly told Officer White that he was "heavily armed and the door is barricaded. If anybody comes through that he's going to open fire." He stated he had "a handgun." After several hours of negotiation, Officer White persuaded appellant to surrender. He told appellant "to leave the handgun at the top of the steps which leads down to the front door." Appellant, unarmed, exited the front door with his hands raised and was taken into custody. During the negotiation process, a number of neighbors and members of appellant's family had arrived on the scene.

Immediately following the surrender, Sergeant Barnett and two other officers opened the front door and proceeded up the stairs. The purpose of the entry, as Sergeant Barnett testified, was for a "protective sweep and attempt to locate a handgun that we believed was inside." A

---

[1] Defendant interposed a hearsay objection to this testimony. The trial court, nonetheless, accepted the testimony upon the representation by the Commonwealth that it was "not being offered for the truth of the matter but just for what the officers do next and how things progressed." The question of an entry by the consent of Ms. Bowman, the actual tenant, was not presented to the trial court or to this Court. Accordingly, we will not address it.

handgun was found in plain view "on top of the banister at the top of the staircase." The sergeant and the other officers searched the apartment "to see if there was anyone else in there," "for the presence of other people." The "sweep" did not involve a search into "cupboards" or "drawers" but only into areas in which a person could be found. When asked if he was not going in just to look for other people, but also for the gun, Sergeant Barnett replied, "Yes, that was secondary. The securing of the weapon."

The weapon recovered from the top of the staircase, where appellant had been directed by the negotiator to place it, was identified as a loaded, functional semiautomatic nine-millimeter handgun. Barnett testified that the "sights, trigger, hammer, all seemed to be functional." In response to the trial court's question "Is it operational," Barnett testified "as best as I can tell, yes, Your Honor. The slide goes forward, trigger works, the hammer . . . the barrel's intact." The appellant was indicted for possession of a firearm after having been previously convicted of a violent felony, in violation of Code § 18.2-308.2. At trial, appellant argued a motion to strike on the basis that the Commonwealth failed to show the firearm seized was operational. The trial court denied that motion, and appellant appealed the issue to this Court.

A motion to suppress the handgun was filed on the grounds that the warrantless search and seizure of the same violated Code § 19.2-60[2] and the Constitutions of Virginia and the United States. After hearing evidence and relevant argument, the trial court denied the motion, finding, *inter alia*, that exigent circumstances permitted the police "to do a protective sweep to make sure there's no one else in the apartment who has access to this weapon" and recover the loaded weapon when "the mother and young child . . . will be coming back into the house."[3]

---

[2] Code § 19.2-60 provides, "A person aggrieved by an allegedly unlawful search or seizure may move the court to return any seized property and to suppress it for use as evidence."

[3] In addition to a "protective sweep," the trial court also found the search permissible under the "community caretaker" exception to the warrant requirement. We do not address this

- 5 -

After finding the appellant guilty, and in accordance with the mandatory minimum provisions of Code § 18.2-308.2, the trial court sentenced appellant to five years in the penitentiary.

III.

Our analysis begins with firm recognition of the constitutional principle that warrantless searches are presumptively unreasonable and "that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).

Nonetheless, "[t]he Fourth Amendment [of the United States Constitution] is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." United States v. Sharpe, 470 U.S. 675, 682 (1985) (emphasis in original). See also Jones v. Commonwealth, 29 Va. App. 363, 368-69, 512 S.E.2d 165, 167 (1999). In determining reasonableness, the United States Supreme Court has held on numerous occasions, "there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" Michigan v. Long, 463 U.S. 1032, 1046 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (additional citation omitted). "Reasonableness [ ] is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996).

---

finding. See Armstrong v. Nationwide Mut. Ins. Co., 215 Va. 333, 333, 209 S.E.2d 903, 903 (1974) ("The chancellor, in his opinion letter, set forth alternate grounds for his holding. We must affirm this ruling if the chancellor was correct on either ground. We need consider only the chancellor's first ground . . . .").

- 6 -

A.

ENTRY

In Illinois v. McArthur, 531 U.S. 326 (2001), the United States Supreme Court addressed

warrantless searches:

> We nonetheless have made it clear that there are exceptions to the
> warrant requirement. When faced with special law enforcement
> needs, diminished expectations of privacy, minimal intrusions, or
> the like, the Court has found that certain general, or individual,
> circumstances may render a warrantless search or seizure
> reasonable. . . . Consequently, rather than employing a *per se* rule
> of unreasonableness, we balance the privacy-related and law
> enforcement-related concerns to determine if the entry was
> reasonable.

531 U.S. at 330-31.

An exception to the warrant requirement for a search of premises is the "protective

sweep." In Maryland v. Buie, 494 U.S. 325 (1990), the United States Supreme Court defined

this concept as follows:

> A "protective sweep" is a quick and limited search of premises,
> incident to an arrest and conducted to protect the safety of police
> officers or others. It is narrowly confined to a cursory visual
> inspection of those places in which a person might be hiding. . . .
> [T]he Fourth Amendment would permit the protective sweep
> undertaken here if the searching officer "possessed a reasonable
> belief based on 'specific and articulable facts which, taken together
> with the rational inferences from those facts, reasonably
> warranted' the officer in believing," Michigan v. Long, 463 U.S.
> 1032, 1049-1050 (1983) (quoting Terry v. Ohio, 392 U.S. 1, 21
> (1968)), that the area swept harbored an individual posing a danger
> to the officer or others.

494 U.S. at 327.

In Buie, the area swept included a basement, which officers searched after the defendant

had been taken into custody inside his home. Here, the protective sweep took place immediately

after the defendant had been placed into custody just outside his front door. That distinction,

however, does not in and of itself render a protective sweep unreasonable.

- 7 -

Other jurisdictions agree that a warrantless search into a defendant's home may be reasonable even when the arrest occurs outside the dwelling. In United States v. Lawlor, 406 F.3d 37 (1st Cir. 2005), the court held,

> We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene.

406 F.3d at 41. See also United States v. Cavely, 318 F.3d 987, 995-96 (10th Cir. 2003); United States v. Wilson, 306 F.3d 231, 238 (5th Cir. 2002); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995); United States v. Hoyos, 892 F.2d 1387, 1397 (9th Cir. 1989), overruled on other grounds by United States v. Ruiz, 257 F.3d 1030, 1031 (2001) ("Whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another."); United States v. Steele, 788 F. Supp. 278, 281-82 (N.D. W.Va. 1992); Nelson v. State, 610 S.E.2d 627 (Ga. Ct. App. 2005); People v. Cartwright, 563 N.W.2d 208, 213 (Mich. 1997).

A protective sweep is reasonable if "reasonably articulable facts" exist to show that the area searched "could harbor an individual posing a threat to those on the scene." Lawlor, 406 F.3d at 41. Protective sweeps are thus permissible based on less than probable cause. See Buie, 494 U.S. at 327; United States v. Beckham, 325 F. Supp. 2d 678, 688 (E.D. Va. 2004); People v. Celis, 93 P.3d 1027, 1036 (Cal. 2004) ("A protective sweep can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person." (emphasis in original)).

We acknowledge, as the dissent points out, that the standard for reviewing the existence

of an "exigent circumstances" exception to the warrant requirement is one of probable cause,

Minnesota v. Olsen, 495 U.S. 81, 100 (1990), while the standard for reviewing the protective

sweep exception is one of "reasonable suspicion." Buie, 494 U.S. at 327. That distinction,

however, does not preclude from appellate review what courts have termed exigent

circumstances or including such circumstances in evaluating the propriety of a protective sweep.

Consequently, one author has concluded,

> A "protective sweep" is really a constitutional hybrid. It is a Terry
> - Long protective weapons search of a dwelling . . . . A "protective
> sweep" could also be considered a form of search incident [to
> arrest]. . . . Protective sweeps are thus premised on exigent
> circumstances.

1 John Wesley Hall, Jr., Search and Seizure § 19.24 (3d ed. 2000). For example, in Horton v.

California, 496 U.S. 128 (1990), the Supreme Court cited Buie for the proposition that "a

warrantless search be circumscribed by the *exigencies* which justify its intention." 496 U.S. at

139-40 (emphasis added).

In Verez v. Commonwealth, 230 Va. 405, 337 S.E.2d 749 (1985), the Virginia Supreme

Court approved a warrantless entry based upon exigent circumstances. The Court deemed

relevant, *inter alia*, the following circumstances:

> (1) the degree of urgency involved and the time required to get a
> warrant . . . (3) the possibility of danger to others, including police
> officers left to guard the site . . . (5) whether the offense is serious,
> or involves violence . . . .

230 Va. at 410-11, 337 S.E.2d at 753.

Though dealing with probable cause, in Keeter v. Commonwealth, 222 Va. 134, 278

S.E.2d 841 (1981), the Virginia Supreme Court held,

> [t]he officers are not required to possess either the gift of prophecy
> or the infallible wisdom that comes only with hindsight. They
> must be judged by their reaction to circumstances as they

- 9 -

> reasonably appeared to trained law enforcement officers to exist when the decision to enter was made.

222 Va. at 141, 278 S.E.2d at 846. [4]

Likewise, "[t]he validity of an entry for a protective sweep without a warrant depends on the reasonableness of the response, *as perceived by police*." Cartwright, 563 N.W.2d at 213 (emphasis in original). See also State v. Brennan, 474 S.E.2d 267, 270 (Ga. Ct. App. 1996) ("Although we review police actions from the standpoint of a hypothetical 'reasonable' officer, we must measure those actions from the foresight of an officer acting in a quickly developing situation and not from the hindsight of which judges have benefit.").

Here, the defendant told at least two police officers that he was "heavily armed" and intended to shoot any officer who entered the premises. He later informed Officer White "that he had a handgun." Accordingly, the officers could conclude, by either a probable cause or reasonable suspicion standard, that there was at least one loaded weapon in the area subject to the protective sweep. And, if one claims to be heavily armed, it is reasonable to believe multiple weapons are present. A loaded, accessible weapon, by definition, may cause "danger to the officers or others." Buie, 494 U.S. at 327.

In Steele, the police, responding to a domestic disturbance call, escorted the defendant's girlfriend to an apartment she shared with him. While there officers noticed "a young man" other than the defendant at the residence. As the officers were taking the girlfriend to another location, the defendant, standing in front of the apartment, fired a rifle into the air and retreated

---

[4] This Court has also expressed a reluctance to second-guess the judgment of police officers in the context of a Fourth Amendment search and seizure. See Alston v. Commonwealth, 40 Va. App. 728, 743, 581 S.E.2d 245, 252 (2003) ("Even though this case did not involve a situation that was overtly dangerous . . . 'our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations.'" (quoting United States v. White, 648 F.2d 29, 36 (1981))).

inside the apartment.  He later emerged, unarmed, and was taken into custody.  Affirming the

denial of a motion to suppress, the court stated:

> [T]he parties have subsequently focused their arguments on the existence of exigent circumstances justifying a warrantless search. In particular, the focus rests on the protective sweep exception to the warrant requirement as most recently discussed in <u>Maryland v. Buie</u>, 494 U.S. 325, 108 L. Ed. 2d 276, 110 S. Ct. 1093 (1990).

> \* \* \* \* \* \* \*

> Defendant argues that any reasonable threat to the officers' safety ended upon his arrest approximately ten feet outside his apartment.  Defendant premises this argument upon the claim that the officers cannot point to articulable facts supporting the concern that a person remained inside the apartment and posed a continuing threat to their safety. . . .

> \* \* \* \* \* \* \*

> . . . Defendant eventually surrendered, exiting the residence without the weapon.

788 F. Supp. at 281-82.  Several witnesses testified that "the young man" had left the apartment.

The court continued:

> Defendant was not able to discredit Deputy Martin's testimony that he simply did not know whether the young man remained in the apartment.

> \* \* \* \* \* \* \*

> The Court is absolutely convinced that the above justifies a reasonable inference that a danger may have existed in the interior of the apartment. . . . A loaded, functioning weapon was known to be present in the rear portion of the residence.

<u>Id.</u>

The dissent cites <u>Colbert</u> for the proposition that where a police officer does not "have

any information at all," a reasonable suspicion cannot arise that a residence may harbor "an

individual posing a danger to the officer or others."  We agree.  But in <u>Colbert</u>, there were no

relevant facts, and thus no rational inference therefrom, to raise a reasonable suspicion.

- 11 -

By contrast, police officers here did have information indicating the presence of others inside the apartment. In response to defense counsel's question "was [there] any indication anybody else was in the apartment," Barnett replied, "From some of the neighbors, yes there was." Sergeant Barnett further testified, "I can't say for sure there was no one else in the apartment," because he had seen an unidentifiable person standing near a second story window in the "dark" apartment. These factors certainly provided information for the officers there to be concerned that others might be in the apartment.

As noted above, Buie justified a warrantless entry not just because of potential danger to police but also potential danger to others. The crowd which had gathered, including neighbors, bystanders, and members of the defendant's family, were subject to immediate danger if the weapon or weapons were accessible to any individual who might still be in the apartment or in the crowd that had gathered. Moreover, that crowd compounded the problem of denying access to the premises pending application for a search warrant.

The facts in this case are undisputed. Accordingly, we are to decide *de novo* the "ultimate question" of whether or not the officers violated the Fourth Amendment. Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citation omitted). That question is whether these facts, to a prudent officer on the scene, generated a "reasonable suspicion" that the apartment may "harbor an individual posing a danger to the officers and others." Buie, 494 U.S. at 327. We conclude the "reasonable suspicion" threshold was met given the presence of both exigent circumstances and at least one loaded weapon. The protective sweep here was a "quick and limited minimal intrusion," as prescribed by Buie. Id. After "balanc[ing] the privacy-related and law enforcement-related concerns," we hold the protective sweep did not violate the Fourth Amendment. McArthur, 531 U.S. at 331. Accordingly, the trial court properly denied the motion to suppress.

- 12 -

B.

PLAIN VIEW

In Harris v. Commonwealth, 241 Va. 146, 400 S.E.2d 191 (1991), the Virginia Supreme

Court reiterated the requirements of the "plain view doctrine":

> "It is . . . an essential predicate to any valid warrantless seizure of
> incriminating evidence that the officer did not violate the Fourth
> Amendment in arriving at the place from which the evidence could
> be plainly viewed.  There are, moreover, two additional conditions
> that must be satisfied to justify the warrantless seizure.  First, not
> only must the item be in plain view, its incriminating character
> must also be 'immediately apparent.'  Second, not only must the
> officer be lawfully located in a place from which the object can be
> plainly seen, but he or she must also have a lawful right of access
> to the object itself."

241 Va. at 153, 400 S.E.2d at 195 (quoting Horton, 496 U.S. at 136-37 (additional citations

omitted)).  "The phrase 'immediately apparent' has been construed as requiring that the

investigating officer possess probable cause to seize the item without further investigation."

Taylor v. Commonwealth, 10 Va. App. 260, 266, 391 S.E.2d 592, 595 (1990).

In Crosby v. Commonwealth, 6 Va. App. 193, 367 S.E.2d 730 (1988), this Court upheld

the seizure of a weapon, a sawed-off shotgun, found in plain view by officers while securing the

defendant's apartment.  There, the Court held that officers were justified in securing the

premises, described as a "limited security check" akin to the protective sweep conducted in this

matter.  "Because [the] Detective [] was lawfully securing the premises, the evidence in plain

view, i.e., the sawed-off shotgun, was subject to seizure under the plain view exception to the

warrant requirement."  6 Va. App. at 202, 367 S.E.2d at 736.

Here, we held that the police officers did not violate the Fourth Amendment by

conducting a protective sweep of the apartment.  Because of the appellant's threats to police and

repeated claims of being "heavily armed," officers had probable cause to believe that the gun, in

plain view at the top of the stairs, was connected to appellant's criminal activity.  See Cantrell v.

- 13 -

Commonwealth, 7 Va. App. 269, 285, 373 S.E.2d 328, 336 (1988) ("The police [] had probable cause to associate these items with criminal activity."). Therefore, it was permissible for officers to seize the gun as a part of their protective sweep of the apartment. Accordingly, the trial court properly denied appellant's motion to suppress.

IV.

Additionally, appellant argued during his motion to strike that Code § 18.2-308.2 requires the Commonwealth to prove the seized firearm was operable and that the Commonwealth failed to do so. However, in Kingsbur v. Commonwealth, 267 Va. 348, 351, 593 S.E.2d 208, 210 (2004), the Virginia Supreme Court defined the burden of the Commonwealth under this statute. "The Commonwealth was required to prove beyond a reasonable doubt that the handgun . . . was designed, made, and intended to fire or expel a projectile by means of an explosion. It was not obligated to prove that the handgun was operable." Id. See also Armstrong v. Commonwealth, 263 Va. 573, 583-84, 562 S.E.2d 139, 145 (2002) ("And we are further of opinion that to read into Code § 18.2-308.2 by implication a requirement that the meaning of the term 'firearm' includes an element of present capacity or operability would amount to an unreasonably restrictive interpretation of that term and subvert the intent of the General Assembly.").[5] Accordingly, appellant's argument that the Commonwealth must prove operability under Code § 18.2-308.2 lacks merit, and we hold the trial court properly denied his motion to strike.

---

[5] On brief, "appellant acknowledges that the Virginia Supreme Court rejected [his] interpretation [of Code § 18.2-308.2] in Armstrong . . . ."

V.

For the foregoing reasons, we affirm the trial court's denial of appellant's motion to suppress and find the evidence sufficient to sustain the conviction.

<u>Affirmed.</u>

Humphreys, J., dissenting.

Because I disagree with the majority's assertion that the officers' entry into the home constituted a valid protective sweep, I respectfully dissent. Under the circumstances of this case, the Commonwealth failed to articulate any facts that would have justified an objectively reasonable belief that an individual inside the home posed a danger to the arresting officers. Thus, I would hold that the trial court should have granted Williams' motion to suppress, and I would reverse his conviction for possession of a firearm by a convicted felon.

Initially, I note that the trial court, when denying the motion to suppress, relied upon two separate legal theories, only one of which is discussed by the majority. First, the trial court found that the warrantless entry was permissible because the officers were "entitled to do a protective sweep to make sure there's no one else in the apartment who has access to this weapon that Mr. Williams has told them is there." Second, the trial court held that the community caretaker doctrine validated the warrantless entry, reasoning that the weapon was "left out in an open situation where the child could get to it if they came back into the house." In my opinion, neither doctrine validates the warrantless search at issue in this case.

I.

Warrantless searches are presumptively unreasonable. See, e.g., Megel v. Commonwealth, 262 Va. 531, 534, 551 S.E.2d 638, 640 (2001). This is quintessentially so when police search a person's home. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house," Steagald v. United States, 451 U.S. 204, 212 (1981), and, "[a]bsent exigent circumstances, the threshold [of a dwelling] may not reasonably be crossed without a warrant," Hill v.

- 16 -

Commonwealth, 18 Va. App. 1, 3, 441 S.E.2d 50, 52 (1994).  As noted by the majority, however, the Supreme Court has delineated various exceptions to this rule, one of which is the "protective sweep" doctrine.

In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court defined a "protective sweep" as "a quick and limited search of the premises, incident to an arrest[, which is] . . . conducted to protect the safety of police officers or others[, and] . . . is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  Id. at 327.  In Buie, however, the Court distinguished between two "tiers" of protective sweeps.  First, an arresting officer, "as a precautionary matter and without probable cause or reasonable suspicion," may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  Id. at 334.  "Beyond that, however, . . . there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Id.

Under the circumstances of this case, Williams was arrested outside of the apartment building.  Because the area to be swept was not "immediately adjoining the place of arrest," the "first tier" standard for protective sweeps is clearly inapplicable.  See Sharrar v. Felsing, 128 F.3d 810, 824 (3d Cir. 1997) ("[A] sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the Buie analysis."); State v. Spencer, 848 A.2d 1183, 1193 (Conn.) ("In the present case, the defendant was arrested in a first floor common hallway at the bottom of a stairway of approximately twelve to fourteen steps leading up to his second floor apartment.  Therefore, the defendant's apartment cannot be characterized as a space 'immediately adjoining' the place of arrest."), cert. denied, 543 U.S. 957 (2004); cf. Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) ("*If the suspect moves about*,

- 17 -

an officer is justified in staying with the individual during the course of the stop and conducting a protective search of the areas which come within the suspect's immediate control, even if this action necessitates entry into the suspect's home." (emphasis added)).[6]

Rather, this case must be analyzed under the standard articulated for the "second tier" of protective sweeps—specifically, the Commonwealth must have presented "articulable facts" that would have warranted an objectively reasonable belief that the apartment continued to "harbor an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334; see also United States v. Jeffers, 342 U.S. 48, 51 (1951) (noting that the government bears the burden of establishing facts sufficient to support application of an exception to the warrant requirement); Megel, 262 Va. at 534, 551 S.E.2d at 640 ("[T]he Commonwealth has the heavy burden of establishing an exception to the warrant requirement."). Notably, because Williams was already in police custody, "the focus of our inquiry is 'whether the arresting officers reasonably believed that *someone else inside the [home]* might pose a danger to them.'" Spencer, 848 A.2d at 1194 (quoting United States v. Colbert, 76 F.3d 773, 777 (6th Cir. 1996)) (emphasis and alteration in original).

---

[6] I agree, however, that the fact that an arrest occurred outside a home does not, in and of itself, preclude the officers from conducting a protective sweep inside the residence. See, e.g., United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005) ("We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene."). However, because, under those circumstances, the officers would not have yet crossed the threshold of the residence, the Commonwealth must provide a strong showing of articulable facts sufficient to justify the belief that there was an individual inside the house and that, absent immediate intervention, that individual poses a danger to the arresting officers. I further note that the risk of harm to the arresting officers cannot be created merely by the fact that the officers entered the residence, for, in that situation, the officers would have created the risk of harm themselves, something they are not constitutionally permitted to do. See, e.g., United States v. Webster, 750 F.2d 307, 328 (5th Cir. 1984) (holding that, where law enforcement officers "create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby").

Although the majority recognizes this general rule, it fails to apply it to the facts of this particular case.[7] Specifically, the record is devoid of any "articulable facts" that would support a reasonable suspicion that "an individual posing a danger" to the arresting officers was inside the "area to be swept." Buie, 494 U.S. at 334. Thus, in my view, the officers' entry cannot be validated as a "second tier" protective sweep. See id.

In Walls v. Commonwealth, 2 Va. App. 639, 347 S.E.2d 175 (1986), for example, this Court invalidated a post-arrest warrantless entry into the defendant's home, reasoning that the entry was unconstitutional because the officer "pointed to no specific facts from which he could reasonably have concluded that either he or anyone else was in danger." Id. at 648, 347 S.E.2d at 180. Although recognizing that "there is an exception to the warrant requirement allowing police officers to enter a building in response to a dangerous situation or an emergency," we reasoned that the protective sweep doctrine did not apply because "there was no evidence[] that there were dangerous persons in the [residence]." Id. at 649, 347 S.E.2d at 181.

Similarly, here, the officers "pointed to no specific facts" that would have led the officers to believe "there were dangerous persons in the [residence]." Id. The Commonwealth presented no evidence that the apartment, a private residence in which a small child had been sleeping,

---

[7] The majority apparently relies on a hybridization of the exigent circumstances exception and the protective sweep doctrine. Although I recognize the similarities between the two theories, they are, in fact, separate and distinct constitutional doctrines requiring the application of different legal standards. Specifically, officers may enter a home under the exigent circumstances exception if they have probable cause to believe that an individual inside the home poses a present danger to the public at large. See Minnesota v. Olsen, 495 U.S. 91, 100 (1990) ("[I]n the absence of hot pursuit there must be at least probable cause to believe that [exigent circumstances exist]."). A protective sweep, however, "can be justified by a standard lower than probable cause, namely, reasonable suspicion." People v. Celis, 93 P.3d 1027, 1036 (Cal. 2004); see Buie, 494 U.S. at 334 (analogizing a protective sweep to a brief pat down under Terry v. Ohio, 392 U.S. 1 (1968), or a search conducted during a traffic stop under Michigan v. Long, 463 U.S. 1032 (1983), both of which are founded upon a reasonable suspicion that the search is necessary to protect officer safety). However, because the "lower standard" for performing a protective sweep under Buie "was not satisfied here, it follows that the higher standard requiring probable cause was not met either." Celis, 93 P.3d at 1036.

might be harboring additional dangerous individuals.  See Spencer, 848 A.2d at 1196 (invalidating protective sweep where "the officers' testimony reveal[ed] that they had no information that any person who posed a threat to the officers or to others might have been in the apartment at that time"); cf. United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (upholding post-arrest protective sweep into defendant's home where an informant "had advised officers . . . that [the defendant's] 'boys' or 'counterparts' might be with him").  After making their presence known, the officers secured the premises and did not observe anyone other than Bowman and her child entering or exiting the apartment.  Cf. United States v. Steele, 788 F. Supp. 278, 282 (N.D. W.Va. 1992) (holding that the officers presented sufficient articulable facts to justify a "reasonable inference that a danger may have existed in the interior of the apartment" where, *inter alia*, "there had been a brief period during which a person could have arrived at the apartment unobserved by the officers").

Moreover, during the course of his extended conversations with law enforcement officials, Williams never implied that anyone else was inside the apartment.  Cf. Crosby v. Commonwealth, 6 Va. App. 193, 202, 367 S.E.2d 730, 736 (1988) (upholding warrantless entry based, in part, on the defendant's "evasiveness when [police] asked him if anyone was at the apartment").  The officers did not see anyone else inside the apartment, nor, after Williams emerged, did they observe any signs—such as voices or sounds—that anyone remained in the apartment.  See, e.g., People v. Celis, 93 P.3d 1027, 1035 (Cal. 2004) (holding that a post-arrest protective sweep of the defendant's home was not justified where the officers "had no knowledge of the presence of anyone in defendant's house," reasoning that "[t]he facts known to the officers before they performed the protective sweep fell short of what Buie requires").  And,

- 20 -

indeed, the record is clear that neither officer subjectively believed that anyone other than Williams remained inside the apartment after he emerged from the residence.[8]

Accordingly, the Commonwealth failed to carry its "heavy burden" of presenting any "articulable facts" that would have justified an objectively reasonable belief that another individual was inside the residence, much less that there was an individual inside the apartment who posed a danger to the fifteen or twenty law enforcement officers surrounding the apartment.

---

[8] The majority states that the officers had information from "neighbors" that individuals other than Williams might be inside the apartment. I believe, however, that this assertion inaccurately characterizes the testimony of the police officer. The entire evidence on this point—elicited during cross-examination—reads as follows:

> [Defense Counsel]: And *after Ms. Bowman and her daughter left*, there was no indication anybody else was in the apartment?
>
> [Officer]: From some of the neighbors, yes, there was. We had several people come up –
>
> [Defense Counsel]: From your observations.
>
> [Officer]: Not immediately, no, sir. Not until after some conversation with an individual on the phone did I see somebody inside the apartment.
>
> [Defense Counsel]: Which was him?
>
> [Officer]: Yes.
>
> [Defense Counsel]: Mr. Williams?
>
> [Officer]: Yes.
>
> [Defense Counsel]: *That's the only person you saw?*
>
> [Officer]: *Yes*, but at the time I didn't know it was him.

(Emphasis added). Taken in context, then, the officer's testimony clearly establishes that, "after Ms. Bowman and her daughter left," the officer believed there was one other individual inside the apartment, specifically, Williams. This testimony, even when viewed in the light most favorable to the Commonwealth, does not establish that the officer believed individuals other than Williams remained in the apartment after he emerged.

Although, as the officers testified, the police did not know "for sure there was no one else in the apartment," it is clear that "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." Colbert, 76 F.3d at 778 (holding that a protective sweep was unconstitutional where the officer "didn't have any information at all" as to whether "anyone was inside the [defendant's] apartment"); see also United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir. 1988) (holding that a protective sweep was unconstitutional where officers had "no information that any other persons were in the apartment"). As the Sixth Circuit has explained,

> allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep. . . . [A]llowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court's explicit command in Buie that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home. "No information" cannot be an articulable basis for a sweep that requires information to justify it in the first place.

Colbert, 76 F.3d at 778; see also State v. Hopkins, 55 P.3d 691, 695 (Wash. Ct. App. 2002) ("[A] 'general desire to be sure that no one is hiding in the place searched is not sufficient' to justify a protective sweep outside the immediate area where an arrest has occurred." (quoting State v. Schaffer, 982 P.2d 961, 966 (Idaho Ct. App. 1999))).

Thus, because the Commonwealth failed to present any "articulable facts" from which a reasonable police officer could infer that the apartment was harboring an individual who posed a danger to "those on the arrest scene," Buie, 494 U.S. at 334, I would hold that the officers could not, consistent with the Fourth Amendment, cross the threshold of the apartment in order to conduct a protective sweep. See Walls, 2 Va. App. at 649, 347 S.E.2d at 181.

- 22 -

II.

Because I would find that the trial court erred in its application of the protective sweep exception to the warrant requirement, I must address the remaining legal theory articulated by the trial court in support of its ruling. However, for the reasons that follow, I likewise conclude that the trial court's reliance on its second articulated basis for denying the motion to suppress, the community caretaker doctrine, was error.

The "community caretaker doctrine" authorizes, under certain circumstances, a warrantless search of a residence if that search is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 436-37 (1973); see also Kyer v. Commonwealth, 45 Va. App. 473, 612 S.E.2d 213 (2005) (*en banc*). The appropriateness of applying the community caretaker doctrine is determined by whether, based upon the totality of the circumstances, it was reasonable for the officer to believe that his or her actions were necessary for, *inter alia*, protection of the public and the police from physical danger. Williams v. Commonwealth, 42 Va. App. 723, 730, 594 S.E.2d 305, 309 (2004). Overall, "[o]bjective reasonableness remains the linchpin of determining the validity of [the] action." Commonwealth v. Waters, 20 Va. App. 285, 290, 456 S.E.2d 527, 530 (1995).

When a law enforcement officer conducts a warrantless entry in an attempt to protect against "physical danger," however, this Court has held that the entry does not fall within the scope of the community caretaker doctrine unless the officer possessed a reasonable belief that "someone's health or safety is genuinely threatened." Kyer, 45 Va. App. at 480, 612 S.E.2d at 217. Here, the trial court found that the community caretaker doctrine validated the warrantless entry because the gun was "left out in an open situation where the child could get to it if they came back into the house or when they came back into the house." It is undisputed, however,

that the child was not, in fact, inside the apartment at the time of Williams' arrest. Nor, according to their trial testimony, did the officers believe that any other individual remained inside the apartment. And Williams, the only identifiable person who might have posed a threat, was outside, handcuffed, lying on the ground, and surrounded by fifteen to twenty police officers. Because Williams "was in custody, he no longer posed a threat to the [public or the] police." Henry, 48 F.3d at 1284.

Thus, the officers could not have reasonably believed that anyone—including the child—faced a risk of immediate harm or injury. Indeed, had the mother and child returned to the apartment, the officers could have ensured their continued safety merely by "freezing the scene" and preventing them from entering the apartment until a search warrant had been obtained and executed. Accordingly, I would also hold that the trial court erred in its alternate conclusion that the community caretaker doctrine validated the warrantless entry. See, e.g., United States v. McGough, 412 F.3d 1232, 1239 (11th Cir. 2005) (holding that the community caretaker doctrine was inapplicable where the police "had the situation under control" because the defendant "was under arrest and in custody in the police cruiser," and there were no "exigent circumstances, such as the sounds of gunshots, fighting [or] the potential danger to human life . . . that would have justified the officers' decision to enter [the defendant's] home"); cf. Lowe v. Commonwealth, 218 Va. 670, 677, 239 S.E.2d 112, 117 (1977) (holding that a warrantless entry was justified by exigent circumstances where "the officer had just ascertained the whereabouts of [an] armed robber," and the robber "was in close proximity to two deadly weapons in plain view," reasoning that "[t]he delay, however slight, incident to obtaining a warrant would . . . increase[e] the danger of further violence to the police themselves and to the community at large").

III.

Unquestionably, "the work of a police officer in the field is often fraught with danger." Celis, 93 P.3d at 1036. However, "[s]ociety's interest in protecting police officers must . . . be balanced against the constitutionally protected interest of citizens to be free of unreasonable searches and seizures." Id. "In considering both interests, the United States Supreme Court has articulated certain legal rules," id., and this Court is not at liberty to ignore those established constitutional standards. For this reason, I would hold that the warrantless entry in this case does not fall within the scope of the community caretaker exception, nor was it a permissible "protective sweep."

Because the warrantless entry and search violated Williams' Fourth Amendment rights, I would hold that the trial court erred in denying Williams' motion to suppress. And, because I would reverse and remand this case for a new trial if the Commonwealth be so advised, I would not reach the issue of whether the evidence was sufficient to support Williams' conviction. Thus, I respectfully dissent.